IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SHANNA THORNTON, JENNIFER
PRATER, and HEATHER KIDD,

                    Plaintiffs,

          v.

CRAZY HORSE, INC., JEANETTE H.
JOHNSON, SANDS NORTH, INC. d/b/a/
FANTASIES ON 5TH AVENUE,
KATHLEEN HARTMAN, CAROL J.
HARTMAN, and MARCO GONZALEZ,

                    Defendants.

Case No. 3:06-cv-00251-TMB

MEMORANDUM OF DECISION

## I.     INTRODUCTION

The Defendants in this case operate clubs featuring adult entertainment in Anchorage,

Alaska.  Defendants Crazy Horse, Inc. and Jeanette H. Johnson (the "Crazy Horse Defendants")

operate an establishment known as the Crazy Horse Saloon ("Crazy Horse").  During all relevant

times, Defendants Sands North, Inc. d/b/a/ Fantasies on 5th Avenue ("Sands North"), Kathleen

Hartman, Carol J. Hartman, and Marco Gonzalez (the "Fantasies Defendants") operated an

establishment known as Fantasies on 5th Avenue ("Fantasies").  Plaintiffs Shanna Thornton,

Jennifer Prater, and Heather Kidd were formerly employed as dancers at the clubs.  In this

action, they have asserted claims against Defendants for violations of the Fair Labor Standards

Act ("FLSA"), the Alaska Wage and Hour Act ("AWHA"), and Alaska Statutes § 23.05.140.[1]

Specifically, Plaintiffs seek to recover:  (a) unpaid wages resulting from hourly charges levied by

_____
[1] *See* Dkt. 63.

1

Defendants that they claim reduced their wages below the minimum wage; (b) unpaid overtime; (c) other allegedly compulsory charges; and (d) amounts that they claim they were forced to "tip out" to other employees as part of an illegal tip pool. Plaintiffs bear the burden of proving that they were not properly compensated.[2]

The Court held a four day bench trial commencing on January 3, 2012.[3] The Parties subsequently submitted written summary arguments and proposed findings of fact and conclusions of law.[4] Federal Rule of Civil Procedure 52(a) provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Having considered the testimony of the witnesses, exhibits admitted into evidence, and the Parties' submissions, the Court makes the findings of fact and conclusions of law set forth below.[5]

---

[2] *See Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998) (citation omitted).

[3] *See* Dkts. 207, 208, 210, 211.

[4] Dkts. 227, 228, 229, 230. These submissions were filed on April 9, 2012, after the Court granted two requests for extensions of time. Dkts. 223, 226.

[5] In this memorandum of decision, the Court does not purport to recite all of the evidence submitted and arguments made by the Parties, but rather focuses on the evidence and arguments supporting the Court's findings and conclusions. *See* Fed. R. Civ. P. 52(a) advisory committee's note ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.").

## II.    FINDINGS OF FACT

*A.    The Evidence*

*1.    Witnesses*

1.    Twelve witnesses testified at the trial.[6]  The three Plaintiffs all testified on their

own behalf.  Plaintiffs also called Monique Alicia Seybold, a former dancer at Crazy Horse, as a

rebuttal witness.  The Court finds that Plaintiffs' testimony was generally credible; however, as

discussed below, Plaintiffs' recollections were more favorable to their present litigation position

than what likely occurred in several respects, most notably, those bearing on their potential

damages calculations.  The Court also finds that Seybold's testimony was generally credible.

2.    The Crazy Horse Defendants called Jeanette Johnson, Mark R. Yost, Irina

Gabryushina, Mernie Anna Myrtle Davies, Jenada Johnson, and Barbara Taylor.  At all relevant

times, Jeanette Johnson has been the owner and manager of Crazy Horse.[7]  Yost is a former

doorman[8] and Gabryushina is a former dancer at Crazy Horse.[9]  Davies currently works and

previously worked at Crazy Horse in a number of different roles, including as a "house mom"

(i.e., floor manager), bartender, and waitress.[10]  Jenada Johnson is Jeanette Johnson's daughter

---

[6]  *See* Dkt. 212.

[7]  Dkt. 219 at 157:20-158:2.

[8]  Dkt. 220 at 141:25-142:9.

[9]  *Id.* at 156:12-15.

[10]  *Id.* at 171:1-23.

3

and is the payroll manager at Crazy Horse.[11] Barbara Taylor is Jeanette Johnson's sister and is a house mom at Crazy Horse.[12]

3.　　　The Court finds that Gabryushina, Davies, Jenada Johnson, and Taylor generally testified credibly. Jeanette Johnson and Yost, however, did not. Jeanette Johnson's testimony was frequently contradicted, including by exhibits, her own prior affidavits, and other witnesses, including other Crazy Horse witnesses. Although the Court does commend Jeanette Johnson for what is undoubtedly her sincere belief in supporting charitable causes, her testimony was defensive, self-serving, and not believable. Additionally, Yost was clearly uncomfortable on the stand, his demeanor suggested that he was not being truthful, and the gist of his testimony – which, in essence, was that he worked for tips, but rarely received them – simply does not make sense. Jeanette Johnson and Yost's lack of credibility serves only to bolster Plaintiffs' testimony.

4.　　　The Fantasies Defendants called Carol Hartman, the current owner of the club and former minority owner of Sands North, and Marco Gonzalez, Carol Hartman's son, who formerly had a two percent interest in Sands North.[13] Kathleen Hartman, who is Carol Hartman's sister and was the majority owner at the time,[14] did not testify. At all relevant times,

---

[11] *Id.* at 219:12-23.

[12] *Id.* at 235:14-236:2.

[13] Dkt. 219 at 98:16-99:4, 111:6-112:5.

[14] *See id*. at 97:22-98:2, 100:16-22.

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 4 of 41

Carol Hartman handled the club's bookkeeping.[15] Gonzalez was the disc jockey and had no management authority.[16] The Court finds that their testimony was generally credible.

5. Resolving the numerous factual disputes in this case has required Court to sort through two or more contradictory but equally plausible accounts put forward by witnesses who were generally credible. In these instances, the Court has weighed the evidence, considered the totality of the circumstances, and the burden of proof to make its findings. In some cases, the Court has made findings consistent with one of these accounts. In others, it has found that the truth lies somewhere in between the Parties' characterizations, and has done its best to determine what it is. Accordingly, in certain instances, the Court has not accepted (in whole or in part) the testimony of witnesses who were generally credible.

*2. Exhibits*

6. The Parties submitted a number of exhibits, most of which were admitted without significant dispute.[17] Crazy Horse's records, however, require further comment. The Court admitted Crazy Horse's daily records, which were kept in spiral bound notebooks,[18] over Plaintiffs' objection.[19] The testimony at trial established that these records were kept using an unorthodox methodology relying heavily on symbols and abbreviations which required lengthy

---

[15] *Id.* at 111:6-112:5.

[16] *Id.* at 95:2-10.

[17] *See* Dkt. 213.

[18] Exs. A-1 – A-15.

[19] Plaintiffs objected to the records because they were not produced until after the close of discovery despite being clearly responsive to their requests. Nonetheless, because Plaintiffs had them for nearly a year before trial, the Court admitted them but indicated that it would consider their late production in evaluating their weight. *See* Dkt. 213; Dkt. 219 at 159:16-171:8, 178:24-187:8.

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 5 of 41

explanations to interpret, were kept by a number of different individuals, that there was no formalized training for keeping the records, that there was no formalized process for determining who was in charge of keeping the records on any particular day, and that there were many instances where the records may have been inaccurate, or at the very least, incomplete. Under these circumstances, the Court finds that Crazy Horse's daily records are unreliable and entitled to no weight.

7. These problems were not limited to the spiral notebooks, however. Crazy Horse's records in general were shown to be highly unreliable. They were kept by many different people who used inconsistent notation methods, are fraught with errors and omissions, and, as Jeanette Johnson conceded, may not be accurate in important respects.[20] Accordingly, the Court has significantly discounted the weight of this evidence.

### B. The Clubs' Operations & Plaintiffs' Employment

#### 1. Crazy Horse

8. Thornton worked at Crazy Horse in 2003 and 2004.[21] Based on her recollection, commencing in September of 2003, she worked a total of 608 standard time hours and 108.5 overtime hours over the course of 83 days of work at Crazy Horse.[22] This included approximately 192 standard time hours, 18.5 overtime hours worked in excess of 40 per week, and 2 hours worked in excess of 8 per day, over the course of 25 days of work between August 22, 2003, and August 21, 2004.[23]

---

[20] *See* Dkt. 219 at 69:17-70:22.

[21] Dkt. 218 at 163:13-21.

[22] Ex. 11; *see also* Dkt. 227-1.

[23] *See* Exs. 2, 11.

6

9.     Prater worked at Crazy Horse from November 2005 to May of 2006.[24]  Based on her recollection, she worked a total of 930 standard time hours and 207 overtime hours over the course of 124 days of work at Crazy Horse.[25]  This did not include any time prior to August 22, 2004.

10.     Kidd worked at Crazy Horse from July 29, 2003, to April 29, 2006.[26]  Based on her recollection, she worked a total of 4,485 standard time hours and 671 overtime hours over the course of 568 days of work at Crazy Horse.[27]  This included approximately 1,513 standard time hours, 51.5 overtime hours worked in excess of 40 per week, and an additional 168.5 overtime hours worked in excess of 8 per day, over the course of 205 days of work between August 22, 2003, and August 21, 2004.[28]  It also included approximately 120 standard time hours and 22.5 overtime hours over the course of 15 days of work prior to August 22, 2003.[29]

11.     The Plaintiffs testified that they generally worked at least eight hours, if not more, although this included time spent changing clothes, doing their hair and makeup, and "get[ting] in the right frame of mind" to work.[30]  Davies indicated that she had never seen a dancer work more than eight hours, although the dancers often did spend significant amounts of time

---

[24] Dkt. 218 at 4:1-4.

[25] Ex. 12.

[26] Dkt. 218 at 88:22-25.

[27] *See* Ex. 4.

[28] *See id*.

[29] *See id*.

[30] Exs. 1, 2, 4; Dkt. 218 at 4:21-5:14, 89:9-20, 109:21-23, 139:15-141:5, 164:5-9; *see also* Dkt. 220 at 195:12-196:2.

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 7 of 41

preparing for work or "hav[ing] coffee or get[ting] something to eat."[31]  There was no requirement that the dancers conduct these activities at the club, as opposed to at home, before they came to work.[32]  The weight of the evidence suggests that to the extent that the Plaintiffs were present at the club for more than eight hours on any given day, approximately one hour was spent preparing for work or on meals.  With that exception, the Court finds that Plaintiffs' estimates based on their recollections support a just and reasonable inference of the amount and extent of their work at Crazy Horse.

12.     At Crazy Horse, the dancers were compensated in a number of ways.  First, the dancers received biweekly paychecks supposedly in the amount of the minimum wage from the club.[33]  Second, dancers received discretionary amounts paid by customers for dances on the club's main stage (referred to as "stage tips").  Third, dancers received fees from customers for "table dances" performed for specific customers.  Fourth, dancers received fees from customers for dances performed for specific customers in the club's VIP room.

13.     There was no established amount for stage tips.  Customers chose to pay or not pay whatever amount they thought was appropriate.[34]

14.     The dancers charged the customers $20 or more for each table dance, which they kept.[35]  The dancers were responsible for collecting these fees, which everyone considered to be "their" property.[36]

---

[31]  *See* Dkt. 220 at 195:12-196:2, 200:6-201:2; *see also id.* at 216:13-217:13.

[32]  Dkt. 219 at 33:18-20.

[33]  *See, e.g.*, Dkt. 218 at 158:11-18.

[34]  *Id.* at 55:22-56:1, 159:15-25; Dkt. 219 at 41:2-17.

15.    The dancers charged the customers $50 or more for each VIP dance. The dancers then paid $10 out of the fee for each dance to the club for the use of the room and kept the remainder of the fee, which belonged to them. The dancers paid the $10 fee to the club either immediately before or after going into the VIP room.[37]

16.    The Parties referred to and regarded the sums collected and retained by the dancers from the customers on stage, for table dances, and for VIP dances as "tips."[38]

17.    The dancers also paid out certain amounts to the club and to other employees. Dancers were required to pay $10 for each hour they worked, or $80 per eight-hour shift, to the club.[39] They did not pay more than $80 per day, and accordingly, were not paid in their biweekly paychecks for any time spent beyond eight hours in any given day.[40]

18.    The primary means by which the club tracked the dancers' time was the amount of hourly house fees they paid.[41] Although there was a time clock, Dancers were not required to clock in and clock out.[42] All other employees were required to do so.[43]

---

[35]  Dkt. 218 at 7:4-22; Dkt. 219 at 41:24-42:1; Dkt. 220 at 95:25-96:6, 102:13-103:15, 198:14-199:9.

[36]  Ex. 10 at 3 ("Get paid for your table dance before you do it. That way you control the dance not the customer. It is not the responsibility of [] any other employee to demand *your* dance fee from any customer after the fact." (emphasis added)); Dkt. 218 at 111:25-112:8.

[37]  Dkt. 218 at 7:23-9:12, 93:2-96:3, 169:10-18; Dkt. 219 at 41:18-23, 42:16-20; Dkt. 220 at 95:4-24, 102:13-104:5, 198:14-199:16. Credit card transactions may have been handled in a different manner, however, the Plaintiffs testified that they rarely dealt with credit card transactions. *See* Dkt. 218 at 59:6-11, 153:15-156:19; Dkt. 219 at 39:15-40:9.

[38]  *See, e.g.*, Dkt. 220 at 165:3-17.

[39]  Dkt. 218 at 11:1-6, 96:11-97:11, 166:19-167:5.

[40]  *See id.* at 109:18-25.

[41]  Dkt. 220 at 245:3-5.

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 9 of 41

19.     The Plaintiffs and Seybold testified that they were instructed by Jeanette Johnson and others at the club that they had to pay tips to – or "tip out" – several other employees, including house moms and house dads, disc jockeys, poker announcers, doormen, and bartenders.  They testified that when they did not pay these sums, they were "intimidate[d]" into doing so by these individuals.[44]  The intimidation consisted of verbal harassment from those receiving the tip outs, including Jeanette Johnson.[45]  Plaintiffs, however, were not threatened with the loss of their employment.[46]  The Crazy Horse witnesses generally indicated that although there may have been some expectations of tip outs, it was not required and, although the other employees may have occasionally asked for tips or complained about not receiving tips, there was no intimidation.[47]  Crazy Horse's "Dance Policies" at the time further indicate that "[i]t is customary to tip the House Moms, Doorm[e]n and DJs either d[ur]ing or at the end of" each shift.[48]

20.     The Court finds that although tipping was expected and frequently solicited in a badgering manner, there was no formal or informal requirement that the dancers tip out other

---

[42]  Dkt. 218 at 5:15-25, 89:23-25, 174:21-175:2; Dkt. 220 at 48:21-57:16, 210:16-211:9.

[43]  Dkt. 218 at 5:15-25, 89:23-25, 174:21-175:2; Dkt. 220 at 48:21-57:16, 104:6-105:10, 210:16-211:9.  Jeanette Johnson testified, in essence, that she does not require the dancers to use the time clock because they are unwilling or unable to do so and many of them are not "sober."  Dkt. 220 at 48:21-57:16.

[44]  Dkt. 218 at 12:20-13:21, 96:11-97:11; 113:14-20, 168:21-169:9; Dkt. 219 at 45:7-10; Dkt. 221 at 4:16-6:2, 9:8-12:14.

[45]  Dkt. 219 at 74:8-75:19.

[46]  *Id.* at 75:20-22.

[47]  *See* Dkt. 220 at 144:8-20, 150:16-151:11, 159:6-160:14, 212:2-216:2.

[48]  Ex. 10 at 3.

employees at Crazy Horse. Tipping among the employees at Crazy Horse was very similar to

tipping in other industries in this country. For example, customers at restaurants are expected to

tip the wait staff and a patron's failure to do so is regarded as an insult. The level of service a

patron receives may vary based on the patron's failure to tip and the environment might become

increasingly uncomfortable if the patron fails to do so. Similarly, at Crazy Horse – although

expected and strongly encouraged – tipping out was not mandated by the club's management as

a condition of employment. To the extent that there may have been isolated instances of

intimidation by some employees, they were not condoned as part of an official or unofficial

management policy. There was evidence to the contrary; however, Plaintiffs bear the burden of

proof on this issue, and the Court finds that they did not satisfy it.

21.     The dancers were also required to attempt to sell souvenirs, such as t-shirts with

the Crazy Horse logo, for $10 each. Plaintiffs testified that if they failed to sell these items

(generally, one per night), they were required to purchase them.[49] The Crazy Horse witnesses

testified that the dancers were permitted to return the items if they failed to sell them.[50]

22.     Crazy Horse also participated in charitable fundraising, including for the

Muscular Dystrophy Association and a drug program called "Freedom Frog." The charitable

promotions occurred for several weeks at a time at different points during the year. During these

periods of time, the dancers did not have to sell souvenirs.[51] The dancers were asked to solicit

---

[49]  Dkt. 218 at 14:17-15:24, 96:11-98:21, 167:6-168:1; Dkt. 219 at 47:8-10.

[50]  Dkt. 220 at 167:14-168:11, 201:17-202:1.

[51]  *See id.* at 97:4-98:4, 99:10-24. Plaintiffs testified that these events occurred "continuously"
throughout their employment, *see, e.g.*, Dkt. 219 at 19:12-15, however, although it may have
seemed "continuous" to the Plaintiffs, the weight of the evidence suggests that the charitable
fundraising events, although perhaps frequent, were not continuous.

11

two $5 donations per night from the customers. Plaintiffs testified that if they failed to do so – which was nearly always – they were required to make the donations themselves.[52] The Crazy Horse witnesses claimed that the dancers were not required to make the donations if they were unable to persuade the customers to do so.[53]

23.     The Court finds that although the dancers were expected to – and arguably even "required" to – attempt to sell souvenirs and participate in charitable fundraising efforts, they were not compelled to purchase items that they could not sell or make charitable donations.[54] As with the tip outs, the Plaintiffs did offer evidence to the contrary, but they also bear the burden of proof and having considered all of the evidence, the Court finds that it was not satisfied.

24.     Jeanette Johnson and numerous others at Crazy Horse kept track of the dancers hours, whether they had sold souvenirs, and solicited charitable contributions in the spiral notebooks, referenced above.[55] The dancers would report their fees from dances (which they referred to as "tips") to the club on "tip slips" or verbally to Johnson or whoever else was in charge of the spiral notebooks.[56] This information was then recorded on sheets summarizing the house fees paid by each dancer to the club (supposedly corresponding to the number of hours

---

[52] Dkt. 218 at 15:25-17:11, 96:11-98:17, 168:2-20; *see also* Dkt. 220 at 168:12-169:9.

[53] Dkt. 220 at 201:17-202:1. Gabryushina did say, however, that the dancers were required to participate in the fundraising. *See id.* at 168:12-169:8.

[54] The Court observes that Plaintiffs did not seek to introduce any of the souvenirs that they claim they purchased or elicit any testimony from Seybold about the souvenirs or charitable fundraising.

[55] Dkt. 219 at 221:11-18.

[56] Ex. H; Dkt. 219 at 233:25-237:6.

worked[57]) for biweekly periods.[58] "Tips" reported by the dancers on the tip slips or verbally were also occasionally recorded in the margin of the sheets.[59] As discussed above, there were significant problems with these records. These sheets were then used to prepare the payroll.[60] Payroll taxes were deducted from both the hourly wages and the reported tips.[61]

25. Jeanette Johnson testified that the "tip" information that the dancers reported to the club was used to determine their withholding taxes and was reported in the club's gross receipts.[62] This claim, however, was not credible because – in addition to the previously noted problems with Johnson's testimony – it would mean that Crazy Horse was including amounts that were undisputedly the employees' "tips" (including the stage tips) in its gross receipts.[63] To the contrary, the weight of the evidence suggests that Crazy Horse reported the house fees that the dancers paid to it (including the hourly $10 charge and the $10 fee for the VIP room) in its gross receipts,[64] and the dancers were taxed on and expected to report (for withholding purposes) the sums they collected from the customers and kept, which everyone regarded as their "tips."

---

[57] *But see* Dkt. 220 at 76:10-77:5.

[58] *See* Ex. I.

[59] *Compare* Ex. I *with* Ex. K; *see also* Dkt. 220 at 77:25-78:13.

[60] Dkt. 220 at 222:2-223:12.

[61] *Id.* at 225:21-228:6.

[62] *Id.* at 131:8-17.

[63] Jeanette Johnson's testimony is also inconsistent with her own prior affidavit. *See* Dkt. 144-2 ¶ 11 (noting that house fees and VIP fees paid by the dancers to Crazy Horse "were taken into and included in the gross receipts of Crazy Horse," but not mentioning the dance fees customers paid to the dancers other than to the extent they were used to pay the house fees).

[64] *See* Dkt. 220 at 229:6-17.

13

26.     Jeanette Johnson testified that she structured the compensation system to require the dancers to pay the club $10 for each hour worked and then pay out $7.15 per hour to the dancers because she "was told by [an] attorney that" she could not require the dancers to pay the club $10 per hour and then pay them back $10 per hour.[65]

27.     The dancer compensation and record keeping system at Crazy Horse were intentionally structured to shift the risk of poor business to, and impose the expenses of running the business on, the individual dancers as if they were independent contractors as opposed to employees and evade the requirements of the FLSA and the AWHA.

2.     *Fantasies*

28.     Thornton worked at Fantasies in 2005 and 2006.[66] She indicated that there were times where she worked over eight hours per day or forty hours in a week.[67] Thornton also testified that she frequently worked longer than the standard five hour shift at Fantasies.[68] She, and other witnesses, also indicated that she spent time there socializing.[69] Based on her recollection, she worked a total of 1,096 standard time hours and 80 overtime hours over the course of 140 days of work at Fantasies.[70] The Court finds that Thornton likely spent extended periods of time totaling approximately one hour for each day she worked at the club socializing.

---

[65] *Id.* at 63:4-64:8.

[66] Dkt. 218 at 176:21-25.

[67] Ex. 3.

[68] Dkt. 218 at 200:5-201:1.

[69] Dkt. 219 at 69:18-23, 97:20-98:4, 130:7-25.

[70] Ex. 14.

14

With that exception, the Court finds that Thornton's estimate based on her recollection supports a just and reasonable inference of the amount and extent of her work at Fantasies.

29.     At Fantasies, the dancers received biweekly paychecks, stage tips, dance fees, and could also make money off of drink commissions.  Dancers received paychecks purportedly paying them $6.15 per hour, despite the fact that the minimum wage at the time was $7.15 per hour.[71]  Taxes were deducted from this amount, as well as $5 per hour in house fees.[72]  Consequently, the dancers' biweekly paychecks were very small.[73]

30.     The dancers also received stage tips for dancing on the main stage and fees for performing table dances.[74]  The dance fees were considered the dancers' property and the dancers were also responsible for collecting those fees from the customers.[75]  Thornton's contract with Fantasies provides that "[a]ny tips collected by the 'employee', and any monies paid them [sic] by customers above and beyond the minimum wage requirement will be retained by the 'employee.'"[76]  The contract also states that dancers are "responsible to report table and lap dance revenues and any additional tips (not reported to the 'Club') to the IRS, and that

---

[71]  Ex. 15; Dkt. 218 at 197:3-7.

[72]  Exs. 6, 15; Dkt. 218 at 195:1-16, 198:4-10; Dkt. 219 at 121:15-122:23.

[73]  *See* Ex. 6.  Thornton's paychecks were often less than twenty dollars.  *See* Ex. 15.

[74]  Dkt. 218 at 183:13-184:6; Dkt. 219 at 96:13-24.  There was no VIP room at Fantasies.  Dkt. 219 at 71:21-72:2.

[75]  Dkt. 218 at 185:18-22; Ex. 5 ("Get paid for your dances in advance!!!  The club is not responsible for collecting *your* money for you."  (emphasis added)).

[76]  Ex. CA at 4.

15

dancers "are not required to surrender to 'Club' any of the table and lap dance revenues except" as necessary to pay the house fees.[77]

31.    Dancers could also make commissions selling drinks.[78]  They were, however, also required to sell a certain amount of drinks per night.[79]

32.    The dancers also had to pay the club $15 in house fees for each hour they worked. The dancers would pay the club $50 (or $10 per hour) in cash for a standard five hour shift.  The remainder of the house fee ($5 per hour) was deducted from the dancers' paychecks.  Dancers were not charged house fees for any time spent beyond a standard five hour shift, and were also not compensated for any such time in their paychecks.[80]  According to the contract Thornton signed with Fantasies, the purpose of the house fees was "to help defray the 'Club[']s' costs."[81]

33.    Dancers were also supposed to fill out slips which indicated the number of dances they had performed, drinks sold, and house fees paid for each night.[82]  The bartenders would then compile this information onto a sheet that they would submit to Carol Hartman, or another person working in the office.  Hartman would then use these sheets to prepare an individualized biweekly chart summarizing each dancer's hours, which also indicated tips declared, drink

---

[77]  *Id.* at 4-5.

[78]  Dkt. 6; Dkt. 219 at 122:4-23.

[79]  Dkt. 218 at 184:18-185:4, 197:13-198:3.

[80]  Ex. 6; Dkt. 218 at 186:1-5; Dkt. 219 at 121:15-122:3.

[81]  Ex. 9.

[82]  *See* Ex. CC.

16

commissions, and house fees paid to the club, among other things, that the dancer would then sign.[83]

34.     There are several discrepancies between the slips that Thornton filled out and the biweekly summary charts prepared by the Fantasies' office.[84]  Thornton testified that she signed blank sheets that someone else later filled in.[85]  Carol Hartman testified that this would not have been possible because the blank forms were locked in the office and the dancers would not sign them until the payroll had been completed and they had been filled out.[86]  In any event, the Fantasies Defendants did not seek to introduce a comprehensive set of records purporting to set forth Thornton's hours.

35.     Hartman testified that all of the income from dances and drinks sold were recorded in the club's business records and reported in the club's gross receipts.[87]  To the extent that this statement suggests that the club reported money that the dancers received from the customers in its gross receipts, however, it was not consistent with the other evidence or the context.[88]  In fact, the dancers were taxed on the fees that they collected and reported (for

---

[83]  *See* Dkt. 219 at 116:4-120:25.

[84]  *Compare* Ex. CC *with* Ex. CB; Dkt. 219 at 114:5-115:17, 146:17-23.

[85]  Dkt. 219 at 59:17-60:10; *see also* Ex. CB.

[86]  Dkt. 219 at 128:10-129:10.

[87]  *Id.* at 154:14-155:25.

[88]  It is also inconsistent with Hartman's prior affidavit.  *See* Dkt. 147-1 ¶ 11 (noting that, at Fantasies, the house fees "were taken into, and included in the gross receipts of the club," but not mentioning the dance fees customers paid to the dancers other than to the extent they were used to pay the house fees).

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 17 of 41

withholding purposes) to Fantasies as "tips,"[89] and Fantasies reported the house fees it collected from the dancers, as well as drink income, in its gross receipts.

36.     Thornton was also required to "tip out" the disc jockey, doormen, and the wait staff.[90]  She indicated that she was expected to participate in the tip out practice, and was threatened or intimidated into doing so.[91]  Specifically, she stated that she was repeatedly questioned by the other employees if she failed to tip them out.[92]  Carol Hartman testified that tip outs were not required, although she candidly acknowledged that the club occasionally had problems with doormen who were harassing the dancers for tips, and that those doormen had been fired.[93]  Regardless, Thornton testified that she does not seek to hold the Fantasies Defendants liable for the tip outs to other employees at Fantasies[94] and the exhibit she prepared summarizing her damages claim against Fantasies does not include any sums for tip outs.[95]

37.     The dancer compensation system at Fantasies was intentionally structured to shift the risk of poor business to, and impose the expenses of running the business on, the individual dancers as if they were independent contractors as opposed to employees and evade the requirements of the FLSA and the AWHA.

---

[89]  *See* Dkt. 219 at 123:13-19, 124:10-25.

[90]  Dkt. 218 at 198:17-20: Dkt. 219 at 73:9-25.

[91]  Dkt. 219 at 74:1-7.

[92]  *Id.* at 89:8-90:6.

[93]  *Id.* at 127:2-128:9.

[94]  *Id.* at 63:14-64:11.  Thornton also did not assert that she had to sell souvenirs or solicit charitable contributions at Fantasies.  *See id.*

[95]  Ex. 14.

18

### III.    CONCLUSIONS OF LAW

Plaintiffs seek to recover:  (1) unpaid wages and overtime plus statutory penalties; and (2) forced tip outs and other charges.[96]  Plaintiffs also seek to hold the Defendants individually and personally liable for these damages.[97]  The Defendants have asserted a number of legal arguments which, if accepted, would either preclude liability or reduce Plaintiffs' damages.  The Court's conclusions of law on these issues are set forth below.[98]

### A.    Wages & Overtime

1.    Plaintiffs seek allegedly unpaid wages and overtime compensation under the FLSA, the AWHA, and Alaska Statutes § 23.05.140.  Whether the compensation structure at the clubs violated the minimum wage laws turns largely on whether the dance fees should be considered service charges, which may be used to off-set minimum wage obligations, or tips, which may not.[99]  The amount of any damages, in turn, will be affected by whether the two or

---

[96]  As discussed above, at trial, Thornton disclaimed any intention of asserting claims for forced tip outs against Fantasies.

[97]  Dkt. 227 at 9-10.

[98]  To the extent that any of the Court's findings of fact are arguably conclusions of law, they are not restated in this section and are incorporated herein by reference.

[99]  The Court notes that it previously rejected the Crazy Horse Defendants' argument that the table dance fees were service charges because dancers could pay the house fees out of their table dance fees, explaining:

> the Plaintiffs had to pay the house fees . . . to Defendants regardless of whether they received any sums from the customers.  In other words, if the club happened to be completely empty, despite being open for business, and a dancer received no money from customers during the course of an hour, she would still have to pay the house fee to the club.  Unlike the server in *Cumbie* [*v. Woody Woo, Inc.*, 596 F.3d 577, 578 (9th Cir. 2010)], who was guaranteed to make at least the minimum wage for each hour of work, Plaintiffs here lost money for each hour of work unless they collected sufficient sums from the customers to make up those losses.  As a result, because these fees were not contingent on the Plaintiffs collecting

19

three year statute of limitations under the FLSA applies, whether Plaintiffs are entitled to liquidated damages under the FLSA and the AWHA, whether they are entitled to recover the "90 day penalty" under § 23.05.140, and whether they have proven that they worked hours for which they were not properly compensated. As set forth below, the Court concludes that Plaintiffs are entitled to damages in the amount calculated at the end of this section.

1.    <em>Applicable Authority</em>

2.    The purpose of both the FLSA and the AWHA is to establish and safeguard minimum wage and overtime compensation standards so as to provide workers with adequate standards of living.[100] Under the FLSA, during all relevant times, employers were required to pay employees a minimum wage of $5.15 an hour[101] and one and one-half times their "regular rate" of pay for any time worked in excess of 40 hours per week.[102] A court may find an employer violating these provisions liable to an employee for the amount of unpaid compensation as well as "an additional equal amount as liquidated damages."[103] The court, in its

---

money from customers, they were not really customer tips or customer service charges – they were charges levied by the employers on the employees. The dancers' obligation to pay these fees existed irrespective of their dealings with the customers. In this sense, they were separate transactions which were not related to the transactions between the dancers and the customers. Thus, because these sums came from the dancers – as opposed to the customers – it does not matter whether the house fees and similar charges were recorded as gross receipts because they could not off-set Defendants' minimum wage obligations to Plaintiffs.

Dkt. 175 at 28-29 (citations omitted).

[100]  § 23.10.050; 29 U.S.C. § 202.

[101]  29 U.S.C.A. § 206(a)(1) (West 1998).

[102]  29 U.S.C. § 207(a).

[103]  § 216(b).

20

discretion, may decline to award liquidated damages or reduce the amount of liquidated damages where the employer demonstrates, to the court's satisfaction, that it was acting in good faith and had reasonable grounds for believing that it was not violating the FLSA.[104]  Actions under the FLSA are "forever barred" unless commenced "within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."[105]

      3.      The AWHA "is based upon" the FLSA and the Alaska Supreme Court has found that "interpretations of the FLSA are relevant in interpreting the AWHA."[106]  The AWHA sets the minimum wage at $7.15 per hour as of January 1, 2003, and further provides that "[a]n employer may not apply tips or gratuities bestowed upon employees as a credit toward payment of the" minimum wage.[107]  It also provides that employers must pay certain qualifying employees overtime compensation at the rate of one and one-half times the regular rate of pay for any hours worked in excess of 40 per workweek or eight per day.[108]  Violating employers may be found liable to the employees for unpaid wages or overtime compensation along with "an additional equal amount as liquidated damages."[109]  The Court may reduce or decline to award an amount of liquidated damages if it believes the employer was acting in good faith.[110]  An

---

[104]  § 260.

[105]  § 255(a).

[106]  *Dayhoff v. Temsco Helicopters, Inc.*, 848 P.2d 1367, 1371 (Alaska 1993).

[107]  Alaska Stat. § 23.10.065(a).

[108]  § 23.10.060.

[109]  § 23.10.110.

[110]  § 23.10.110(d).

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 21 of 41

AWHA claim "is forever barred unless it is started within two years after the cause of action accrues."[111]

4.    Additionally, Alaska Statutes § 23.05.140 provides that employers must pay their employees at regular intervals, must pay them within certain periods of time[112] after the employment ends, and provides penalties for violations.  Under § 23.05.140(d), if the employer fails to pay wages due to a terminated employee within the applicable time periods, the Court may impose "a penalty in the amount of the employee's regular wage, salary, or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount."  A terminated employee has "up to two years and three days after termination to file a claim for unpaid . . . wages, salaries, or other compensation for labor or services" as well as statutory penalties under § 23.05.140.[113]

5.    Claims under § 23.05.140 "are to be construed as claims under the underlying authority that defines what wages are due."[114]  Here, the AWHA constitutes the applicable "underlying authority."[115]  The Alaska Supreme Court has held, however, that a plaintiff may not "seek double recovery of such funds by attempting to recover unpaid wages multiple times under

---

[111]    § 23.10.130.

[112]    The applicable time periods are three working days where employment is terminated by the employer, and the next regular pay day that is at least three days after the employer receives notice where employment is terminated by the employee.  § 23.05.140(b).

[113]    *Quinn v. Alaska State Emp. Ass'n*, 944 P.2d 468, 472 (Alaska 1997) (citing *Reed v. Municipality of Anchorage*, 741 P.2d 1181, 1184-85 (Alaska 1987)).

[114]    *Bruns v. Municipality of Anchorage*, 32 P.3d 362, 369 (Alaska 2001) (discussing *Quinn*, 944 P.2d at 472).

[115]    *See id.*

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 22 of 41

different theories."[116] Accordingly, Plaintiffs may not recover for unpaid wages and overtime under both § 23.05.140 and the AWHA. Additionally, although § 23.05.140 allows a former employee to recover "all" unpaid wages, salaries, or other compensation, but does not revive AWHA claims barred by the AWHA statute of limitations.[117]

### 2. Dance Fees

6. An employer may use service charges, but not tips, to off-set its obligations under the minimum wage laws.[118] In its summary judgment order, the Court found that there was "a genuine issue of material fact as to whether the dance fees were service charges or tips."[119] As the Court noted in that order, there is a lack of agreement among the courts as to whether dance fees constitute tips or service charges.[120] Summarizing the relevant authorities, the Court stated:

---

[116] *Quinn*, 944 P.2d at 473.

[117] *See id.* at 472-73.

[118] *See* Dkt. 175 at 20-30; 29 C.F.R. § 531.55(b) ("[S]ervice charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act."). The sole exception to this rule is the "tip-credit" method, which authorizes employers to take a partial "tip credit" towards the minimum wage obligation based on the employee's tips. 29 U.S.C. § 203(m); 29 C.F.R. § 531.52. The tip credit method, however, is impermissible under Alaska law. Alaska Stat. § 23.10.065.

[119] Dkt. 175 at 21.

[120] *See* Dkt. 175 at 25 (comparing *Reich v. ABC/York-Estes Corp.*, No. 91 C 6265, 1997 WL 264379, at *6-7 (N.D. Ill. May 12, 1997), *Reich v. Priba Corp.*, 890 F. Supp. 586, 594 (N.D. Tex. 1995), *Smith v. Tyad, Inc.*, 209 P.3d 228, 233-34 (Mont. 2009), and *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1358 (M.D. Fla. 1997), with *Matson v. 7455, Inc.*, No. CV 98-788-HA, 2000 WL 1132110, at *5-6 (D. Or. Jan. 14, 2000), *Moody v. Razooly*, No. A099065, 2003 WL 464076, at *7 (Cal. Ct. App. Feb. 25, 2003), and *Alaska v. Investors Unlimited, Inc.*, No. 3AN 92-37 Civ., slip op. at 1 (Alaska Super. Ct. April 27, 1993)). In their summary argument, the Crazy Horse Defendants cite additional authorities that stand for the proposition that dance fees need not enter an employer's gross receipts in order to be considered the employer's property. *See Doe v. Cin-Lan, Inc.*, No. 08-cv-12719, 2010 WL 726710, at *6 (E.D.

23

the factors that provide guidance as to whether a payment is a tip or a service charge are: (a) whether the payment was made by a customer who has received a personal service; (b) whether the payment was made voluntarily in an amount and to a person designated by the customer; (c) whether the tip is regarded as the employee's property; (d) the method of distributing the payment; (e) the customer's understanding of the payment; and (f) whether the employer included the payment in its gross receipts. Thus, the treatment of fees as gross receipts may or may not be determinative, depending on whether other factors also support the conclusion. As explained by one court, if the disputed fees "were truly service charges, they should have been included in the employers' gross receipts for accounting and tax purposes, but if they were not, that is circumstantial evidence that defendants did not actually regard the fees as service charges, but rather as tips."[121]

7.     Considering these factors and the evidence presented at trial, the table dance fees at both Crazy Horse and Fantasies were "tips" which cannot be used to off-set the clubs' minimum wage obligations. At both clubs, the payments were made by customers who had received personal services, were regarded as the dancers' property, were paid directly from the customer to the dancer and kept by the dancer, were not included in the clubs' gross receipts, and were referred to and treated as "tips" by the Parties. Although the payments were not made "voluntarily" in the sense that the customers were obligated to pay some amount for the services they were receiving, the customer could choose the dancer to request the dance from, and could pay more than the price set by the club which the evidence established was a minimum price, but not a maximum.

---

Mich. Feb. 24, 2010); *Ruffin v. Entm't. Of the E. Panhandle*, No. 3:11-CV-19, 2012 WL 761658, at *2 (N.D. W. Va. Mar. 7, 2012) (citing *Cin-Lan*). The Court does not find the relatively cursory analysis in these cases helpful and, in any event, they are not inconsistent with the Court's prior ruling, which acknowledges that inclusion of dance fees in the employer's gross receipts is not necessarily dispositive.

[121] *Id.* at 27-28 (citing *United States v. Conforte*, 624 F.2d 869, 874 (9th Cir. 1980), 29 C.F.R. § 531.35, *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048(GEL), 2006 WL 851749, at *3, *8 (S.D.N.Y. Mar. 30, 2006), and *ABC/York-Estes*, 1997 WL 264379, at *5-7 (alteration marks omitted)).

24

8. The VIP dance fee at Crazy Horse was a hybrid of a service charge and a tip. Ten dollars of the VIP dance fee was regarded as paying for the use of the room, a set non-negotiable amount, regarded as the club's property, paid by the customer to the dancer and then immediately from the dancer to the club, and recorded in the club's gross receipts. The remainder of the fee, however, was for a personal service, set at a minimum amount that (like table dance fees) could be higher, regarded as the dancer's property, paid by the customer to the dancer and kept by the dancer, not recorded in the club's gross receipts, and referred to and treated as a "tip" by the Parties.

9. There was no evidence as to the customers' understanding of any of the fees.

10. Accordingly, the table dance fees and the VIP dance fees retained by Plaintiffs cannot be used to off-set the Defendants' obligations under the minimum wage laws.

### 3. Statute of Limitations

11. If an employer willfully violates the FLSA, the two year statute of limitations may be extended to three years.[122] Although the court should not presume that a violation was willful in the absence of evidence, it may determine that conduct was willful where "an employer disregarded the very 'possibility' that it was violating the statute."[123] Evidence of an employer's knowing or reckless disregard for whether its conduct violated the statute is generally sufficient to establish willfulness.[124]

---

[122] *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003) (citing 29 U.S.C. § 255(a)), *aff'd on other grounds*, 546 U.S. 21 (2005).

[123] *Id.* at 908-09 (citations omitted).

[124] *Id.* at 909 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

12.     Here, the Court observes that there are a number of ways that the clubs could have lawfully compensated the dancers.  Most notably, they could have paid the minimum wage and treated the dance fees as true service charges by requiring the dancers to turn in all dance fees to the club, then paid the dancers back a percentage of those fees on top of the minimum wage. They could have also paid the minimum wage, designated all of the dance fees as tips, and required the dancers to participate in a mandatory tip pool that redistributed the tips among the employees.[125]  Instead, however, despite acknowledging that the dancers were employees entitled to the minimum wage, the clubs seemed set on defying the law by forcing the dancers to start off each hour of work at a loss unless they made sufficient dance fees to cover the house fees.  This compensation scheme appears to have been structured with the purpose of exploiting the dancers and defeating the wage and hour laws.[126]

13.     The Crazy Horse Defendants record keeping practices also suggest – at the very least – a reckless disregard for the minimum wage and overtime laws.  Record keeping was atrocious; management never seemed to make any sincere effort to determine when dancers were coming and going or working or not working.  Although all other employees were required to use a time clock, dancers were not.  The only real measure of how much the dancers were working was the amount of house fees they paid, which the dancers had an incentive to understate.

---

[125]  *See Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 578-83 (9th Cir. 2010).

[126]  Notably, the Alaska Supreme Court has previously found that a dancer was an employee, not an independent contractor.  *Jeffcoat v. Alaska*, 732 P.2d 1073, 1078 (Alaska 1987).  The structure of the dancers' compensation systems at the clubs here also appear to have been developed to defeat the import of that decision.

14.     Similarly, the Fantasies Defendants openly sought to impose (or "defray") the expenses of carrying on their business on the dancers, which is impermissible.[127]  Moreover, even ignoring the $15 house fees that dancers were required to pay the club each hour, the dancers were only paid $6.15 per hour, or one dollar less than the minimum wage under state law.  They also appeared to be willfully blind to the possibility that the dancers might be working longer than a standard five hour shift, relying heavily on the amount of house fees paid as evidence of how long the dancers had worked.

15.     Under these circumstances, the Court concludes that the Defendants' conduct was willful and the three year statute of limitations shall apply to Plaintiffs' claims under the FLSA.

### 4.     *Liquidated Damages*

16.     Liquidated damages under the FLSA are designed to be compensatory, as opposed to punitive, and an award of liquidated damages is "the norm."[128]  Courts do, however, "retain discretion to withhold a liquidated damages award, or to award less than the statutory liquidated damages total, where an employer shows that 'despite the failure to pay appropriate wages, the employer acted in . . . good faith[.]'"[129]  In order to qualify for this exception, the employer "bears the 'difficult' burden of proving both subjective good faith and objective

---

[127]  *See Smith v. Woodward*, No. CV-02-547-ST, 2003 WL 23537985, at *11 (D. Or. Sept. 30, 2003) (citing *Reich v. Priba Corp.*, 890 F. Supp. 586, 596 (N.D. Tex. 1995)).  This is because the club's cost of doing business is primarily for its own benefit and cannot be included in the computation of an employee's "wages."  *See* 29 U.S.C. § 203(m) (defining "wage"); Alaska Stat. § 23.10.145 (incorporating the FLSA definitions into the AWHA); *see also* 29 C.F.R. §§ 531.3(d), .32(c).

[128]  *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003) (citing 29 U.S.C. § 255(a)), *aff'd on other grounds*, 546 U.S. 21 (2005).

[129]  *Id.* at 909 (citation omitted).

reasonableness[.]"[130]  The subjective component of the test requires the employer to prove that it "had an honest intention to ascertain what the FLSA requires and to act in accordance with it."[131] The employer must also show that it "had objectively reasonable grounds for believing that the acts or omissions giving rise to the failure did not violate the FLSA.'"[132]  Liquidated damages are "mandatory" where the employer fails to satisfy the test.[133]  The standards under the AWHA are nearly identical, with the only exception being that the employer faces an even "higher" burden of proof to establish good faith, which it must prove "by clear and convincing evidence."[134]  The Ninth Circuit has noted that "a finding of good faith is plainly inconsistent with a finding of willfulness."[135]  Reliance on counsel, however, may be sufficient to establish good faith.[136]

17.    Here, the Court has already found that Defendants' conduct was willful. Although Jeanette Johnson indicated that she consulted an attorney who advised her to pay the dancers back $7.15 of the $10 house fee instead of $10, this hardly excuses the objectively unreasonable practice of compensating employees with a negative hourly rate.  Accordingly, the

---

[130]  *Id.* at 910 (citations omitted).

[131]  *Bratt v. Cnty of L.A.*, 912 F.2d 1066, 1072 (9th Cir. 1990) (citation and alteration marks omitted).

[132]  *Alvarez*, 339 F.3d at 909 (citation omitted).

[133]  *Id.* at 910 (citations omitted).

[134]  *Air Logistics of Alaska, Inc. v. Throop*, 181 P.3d 1084, 1097-98 (Alaska 2008).

[135]  *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) (citation omitted).

[136]  *Throop*, 181 P.3d at 1097-98 (citations omitted).

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 28 of 41

Court concludes that the good faith exception does not apply and Plaintiffs are entitled to liquidated damages under the FLSA and the AWHA.

### 5. 90 Day Penalty

18.    Under Alaska Statutes § 23.05.140(d), an employer who violates that statute "may be required to pay the employee a penalty in the amount of the employee's regular wage, salary, or other compensation from the time of the demand to the time of payment, or for 90 working days, whichever is the lesser amount." The purpose of this penalty is to "to deter employers from withholding wages due their employees."[137] Penalties under this section are "not mandatory" and are "within the sound discretion of the trial court[.]"[138] The court may consider the employer's intent in deciding whether to impose the penalty, but a decision declining to impose a penalty need not be supported by a finding that the conduct was unintentional.[139]

19.    Although the Court has found that the Defendants' conduct displayed a reckless disregard for the minimum wage and overtime laws, the Court declines to award a 90 day penalty on top of the unpaid wages and other damages due under the FLSA, the AWHA, and § 23.05.140. On the facts of this case, those damages will likely be sufficient to deter Defendants and other employers from failing to pay their terminated employees within the time periods set forth by § 23.05.140 in the future.

---

[137]  *Mitchell v. Smith*, 742 P.2d 220, 223 (Alaska 1987).

[138]  *Lowery v. McMurdie*, 944 P.2d 50, 51-52 (Alaska 1997) (citing *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1171 (Alaska 1987)).

[139]  *See id.* (citing *Klondike*, 741 P.2d at 1171); *see also Hallam v. Holland Am. Line, Inc.*, 27 P.3d 751, 756 (Alaska 2001) (indicating that the employer's "good faith bears on" whether the court should award penalties under the statute and citing *Klondike*, 741 P.2d at 1171).

29

### 6.    *Proof of Damages*

20.    Even if the compensatory scheme was structured improperly, Plaintiffs may only recover damages if they can prove that they actually worked hours for which they were not properly compensated.  The FLSA and AWHA both require employers to maintain accurate records of the hours their employees work.[140]  Where an employer has fulfilled this duty, the employees bear the burden of proving that they were not properly compensated.[141]  Where the employer fails to do so, however, the employees may prove their claims if they present evidence from which the court may draw a "just and reasonable inference" of the amount of work they performed for which they were not properly compensated.[142]  At that point, the burden shifts to the employer to present evidence sufficient to establish the precise number of hours worked or to negate "the reasonableness of the inference to be drawn from the employee[s'] evidence."[143]  Where the employer fails to do so, the court may award damages based on the employees' evidence, "even though the result may be only approximate," and must "draw whatever reasonable inferences can be drawn from the employees' evidence."[144]

---

[140]  29 U.S.C. § 211(c); Alaska Stat. § 23.10.100(a).

[141]  *Brock v. Seto*, 790 F.2d 1446, 1447-48 (9th Cir. 1986) (citation omitted); *Geneva Woods Pharmacy, Inc. v. Thygeson*, 181 P.3d 1106, 1009 (Alaska 2008) (citations omitted).

[142]  *Brock*, 790 F.2d at 1448 (citation omitted); *Geneva Woods*, 181 P.3d at 1009 (citations omitted).

[143]  *Brock*, 790 F.2d at 1448 (citation omitted); *Geneva Woods*, 181 P.3d at 1009 (citations omitted).

[144]  *Brock*, 790 F.2d at 1448-49 (citation omitted).

30

21.     Notably, employers are not required to compensate "employees for activities which are preliminary to or postliminary to the principal activity or activities of a given job."[145] Such activities include the "donning and doffing of uniforms and related gear [where] not required by law, rule, the employer or the nature of the . . . work to be performed on the employer's premises."[146] Accordingly, the Ninth Circuit has held that the time spent by police officers donning and doffing their uniforms is not compensable under the FLSA.[147] Similarly, time spent on meals and on rest periods significantly longer than 20 minutes is also not compensable.[148] The same principles apply under Alaska law.[149]

22.     Nonetheless, an employer cannot simply plead ignorance over the fact that its employees have been working hours that they are not being properly compensated for while reaping the benefits of that activity. Work that "[t]he employer knows or has reason to believe" is taking place, is compensable under the minimum wage laws.[150] It is management's duty to prevent work that it does not want to be performed from being performed.[151]

23.     For the reasons discussed above, the Court concludes that the Defendants' records are unreliable and incomplete. Subject to the previously-noted adjustments for time spent

---

[145] *Bamonte v. City of Mesa*, 598 F.3d 1217, 1221 (9th Cir. 2010) (quoting 29 U.S.C. § 254(a)).

[146] *Id.* at 1231.

[147] *Id.* at 1232-33.

[148] 29 C.F.R. §§ 785.18-.19.

[149] *See* Alaska Admin. Code tit. 8, § 15.105(b) (adopting 29 C.F.R. § 785.24-.25, which summarize principles under 29 U.S.C. § 254, and 29 C.F.R. § 785.19).

[150] 29 C.F.R. § 785.11; Alaska Admin. Code tit. 8, § 15.105(b) (adopting 29 C.F.R. § 785.11).

[151] 29 C.F.R. § 785.13; Alaska Admin. Code tit. 8, § 15.105(b) (adopting 29 C.F.R. § 785.13).

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 31 of 41

donning and doffing their outfits, doing their hair and makeup, getting into the proper frame of mind to work, eating meals, and socializing, the Court draws a "just and reasonable inference" of the amount of work Plaintiffs performed for which they were not properly compensated from their recollections as presented at trial and in their related exhibits. Those amounts are set forth in the Court's damages calculation below.

24.     On the basis of Plaintiffs' evidence, the Court concludes that the Defendants failed to pay the minimum wage and overtime compensation as required by the FLSA, the AWHA, and Alaska Statutes § 23.05.140.

### 7.     Damages Calculation

25.     Under the FLSA, the AWHA, and Alaska Statutes § 23.05.140, Plaintiffs are entitled to damages in the amount of unpaid wages and overtime, in addition to liquidated damages. There is substantial overlap among these laws, however, and Plaintiffs are not permitted to recover multiple times for the same injury.[152] Nonetheless, where two or more forms of damages are available to a plaintiff, the court may award the greater of the two.[153]

26.     In order to calculate the amount of wages that Plaintiffs are owed, the Court must determine the amounts necessary to bring Plaintiffs' wages up to the minimum wage, overtime compensation, and liquidated damages. In order to reach the minimum wage as putatively arrived at in their paychecks, Plaintiffs must be paid back the house fees they paid for each hour of standard time that they worked. After reimbursement for the house fees, Plaintiffs' paychecks

---

[152]  *See, e.g.*, *Quinn v. Alaska State Emp. Ass'n*, 944 P.2d 468, 473 (Alaska 1997).

[153]  *Pineda-Herrera v. DA-AR-DA, Inc.*, No. 09-CV-5140 (RLM), 2011 WL 2133825, at *5 (E.D.N.Y. May 26, 2011); *Wicaksono v. XYZ 48 Corp.*, No. 10 Civ. 3635(LAK)(JCF), 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011) (citations omitted), *adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011).

32

will actually cover the Defendants' minimum wage obligations.  Overtime can be calculated by multiplying the number of qualifying overtime hours by one and one-half times the Plaintiffs' "regular rate" of pay.  Liquidated damages are an amount equivalent to the unpaid wages and overtime compensation.

27.     For the period from August 22, 2004, through August 22, 2006, the AWHA provides the greatest measure of damages.  For that period, the Court calculates Plaintiffs' damages from the Crazy Horse Defendants as follows:

|  | *Thornton* | *Prater* | *Kidd* |
|---|---|---|---|
| Days | 58.00 | 124.00 | 363.00 |
| ST Hours | 416.00 | 930.00 | 2852.00 |
| Average ST Hours/Day | 7.17 | 7.50 | 7.86 |
| OT Hours Claimed | 88.00 | 207.00 | 428.50 |
| Deduction | 58.00 | 124.00 | 363.00 |
| OT Hours | 30.00 | 83.00 | 65.50 |
|  |  |  |  |
| ST Owed (Days x Av. ST Hours/Day x $10/hour) | $4,160.00 | $9,300.00 | $28,520.00 |
| OT Owed (OT Hours x $10.725/hour) | $321.75 | $890.18 | $702.49 |
| Total Wages Owed | $4,481.75 | $10,190.18 | $29,222.49 |
|  |  |  |  |
| AWHA Liquidated Damages | $4,481.75 | $10,190.18 | $29,222.49 |
|  |  |  |  |
| Total Damages | $8,963.50 | $20,380.35 | $58,444.98 |

This calculation includes the Court's deduction of an amount of overtime hours equivalent to the number of days each Plaintiff worked to account for time spent donning and doffing their outfits, doing their hair and makeup, getting in the proper frame of mind to work, and eating meals.

28.     The damages calculation for Fantasies is slightly different.  At Fantasies, the standard shift was five hours, not eight.  Accordingly, the Fantasies Defendants need only return the amount of the house fees for the first five hours of any standard time worked on a given day.

33

Any additional standard time hours greater than five would have to be compensated at the state minimum wage rate of $7.15 per hour since they would not have been covered in the paychecks. Additionally, as the Fantasies Defendants only paid dancers $6.15 per hour instead of the applicable minimum wage of $7.15 per hour, the total amount due for each hour of standard time during which a dancer paid the house fees is $16 per hour. Accordingly, for the period from August 22, 2004, through August 22, 2006, the Court calculates Thornton's damages from the Fantasies Defendants as follows:

|  | *Thornton* |
|---|---|
| Days | 140.00 |
| ST Hours Claimed | 1096.00 |
| Deduction | 130.48 |
| ST Hours | 965.52 |
| Average ST Hours/Day | 6.90 |
| Average ST Hours/Day Over 5 | 1.90 |
| OT Hours Claimed | 80.00 |
| Deduction | 9.52 |
| OT Hours | 70.48 |
|  |  |
| ST Owed (Days x 5 hours x $16/hour) | $11,200.00 |
| Additional ST Owed (Days x Av. ST Hours/Day Over 5 x $7.15/hour) | $1,898.50 |
| OT Owed (OT Hours x $10.725/hour) | $755.86 |
| Total Wages Owed | $13,854.35 |
|  |  |
| AWHA Liquidated Damages | $13,854.35 |
|  |  |
| Total Damages | $27,708.70 |

The Fantasies calculation also includes a proportional reduction in the number of standard time and overtime hours Thornton claimed for time spent socializing.

29. Plaintiffs' claims for wages and overtime accruing prior to August 22, 2004, are "forever barred" under the AWHA. However, Plaintiffs may still recover unpaid wages and

overtime prior to August 22, 2004, under § 23.05.140, which allows a plaintiff to recover "all" unpaid compensation owed. Under the FLSA, Plaintiffs may also recover unpaid wages and overtime due from the period between August 22, 2003, and August 21, 2004, since the Court has found that Defendants' conduct was "willful."

30.     Under § 23.05.140, Plaintiffs may recover their unpaid compensation at the applicable rates under Alaska law, which are the state minimum wage and overtime amounts under the AWHA. Plaintiffs may not separately recover that compensation under the FLSA, but may recover liquidated damages under the FLSA in addition to the amounts due under § 23.05.140.

31.     Under the FLSA, a plaintiff seeking damages for failure to pay the minimum wage may only recover the minimum wage due under federal law.[154] In contrast, under the overtime provisions of the FLSA, the "regular rate" of pay is the employee's hourly rate under state minimum wage law to the extent that it is higher than the federal law.[155]

32.     Accordingly, the Court calculates Thornton and Kidd's damages from the Crazy Horse Defendants for the time period prior to August 22, 2004, as follows:

---

[154] *Bruns v. Municipality of Anchorage*, 182 F.3d 924,  No. 97-36060, 1999 WL 288910, at *2 (9th Cir. 1999) (citing *Cosme Nieves v. Deshler*, 786 F.2d 445, 452 (1st Cir. 1986)); *McElmurry v. US Bank Nat'l Ass'n*, No. CV-04-642-HU, 2005 WL 2078334, at *3 (D. Or. Aug. 24, 2005) (same), *adopted*, 2005 WL 2492932, at *2-3 (D. Or. Oct. 7, 2005).

[155] *Pineda-Herrera*, 2011 WL 2133825, at *3 (citing 29 C.F.R. § 778.5).

35

|  | Thornton | Kidd |
|---|---|---|
| Days | 25.00 | 205.00 |
| ST Hours | 192.00 | 1633.00 |
| Average ST Hours/Day | 7.68 | 7.97 |
| OT Hours Claimed | 20.50 | 242.50 |
| Deduction | 20.50 | 205.00 |
| OT Hours | 0.00 | 37.50 |
|  |  |  |
| ST Owed (Days x Av. ST Hours/Day x $10/hour) | $1,920.00 | $16,330.00 |
| OT Owed (OT Hours x $10.725/hour) | $0.00 | $1,807.16 |
| Total Wages Owed | $1,920.00 | $18,137.16 |
|  |  |  |
| FLSA Days | 25.00 | 190.00 |
| FLSA ST Hours | 25.00 | 1513.00 |
| FLSA Av. ST Hours/Day | 192.00 | 7.96 |
| FLSA OT Hours Claimed | 18.50 | 51.50 |
| Deduction | 18.50 | 44.48 |
| FLSA OT Hours | 0.00 | 7.02 |
| Non-FLSA OT Hours Claimed | 2.00 | 168.50 |
| Deduction | 2.00 | 145.52 |
| Non-FLSA OT Hours | 0.00 | 22.98 |
|  |  |  |
| ST Owed (Days x FLSA Av. ST Hours/Day x $8/hour) | $1,536.00 | $12,104.00 |
| Other ST Owed (Non-FLSA OT Hours x $5.15/hour) | $0.00 | $118.33 |
| OT Owed (FLSA OT Hours x $10.725/hour) | $0.00 | $75.32 |
| FLSA Liquidated Damages | $1,536.00 | $12,297.65 |
|  |  |  |
| Total Damages | $3,456.00 | $30,434.81 |

In calculating liquidated damages, the Court has accounted for the fact that overtime under the FLSA only includes hours worked in excess of 40 per week, and does not include hours worked over eight per day, as it does under Alaska law.[156]

---

[156] *Compare* Alaska Stat. § 23.10.060 *with* 29 U.S.C. § 207(a)(1).  For Kidd, the Court applied a proportional deduction to the overtime hours she claimed which qualify under the FLSA and

36

B.    *Tip Outs & Charges*

33.    Plaintiffs also seek to recover the tip outs they contend that they were required to pay to other employees at Crazy Horse and other charges levied by the club, including for souvenirs, for charitable donations, and the VIP room fee. [157]

34.    Absent a contrary agreement, the general presumption is that "[i]n business where tipping is customary, the tips . . . belong to the recipient."[158]  Where there is an agreement for employees "to turn over the tips to the employer," the agreement is presumptively valid absent some "statutory interference."[159]  The FLSA § 3(m) includes a "tip pooling" restriction indicating that "all tips received by" certain employees must be retained by those employees, except that tip pooling among "employees who customarily and regularly receive tips" is permissible.[160]  The tip credit method, however, is prohibited by the AWHA.[161]

35.    Some courts have suggested that tip pools involving management are invalid.[162] In these cases, however, the employers were attempting to utilize the tip credit method.[163]

---

those that did not.  For Thornton, as the amount of the deduction exceeded all overtime hours she claimed, the Court reduced both qualifying and non-qualifying overtime hours to zero.

[157]  Plaintiffs also seek reimbursement of the house fees; however, because the house fees caused the violation of the minimum wage laws, this issue has been addressed in the Court's analysis of damages for those violations.

[158]  *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 579 (9th Cir. 2010) (quoting *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 397 (1942)).

[159]  *Williams*, 315 U.S. at 397; *see also Cumbie*, 596 F.3d at 579 (citing *Williams*).

[160]  29 U.S.C. § 203(m).

[161]  Alaska Stat. § 23.10.065(a).

[162]  *See, e.g.*, *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 230 (S.D.N.Y. 2002); *cf. Cumbie*, 596 F.3d at 578 n.3 (noting that management was not participating in a tip pool found to be valid).  The remedy for such a violation, however, may simply be to ensure that the

Additionally, other authority suggests that managers may participate in a tip pool where they are performing the functions of employees who customarily receive tips.[164]

36.     Under the interpretive regulations for both the FLSA and the AWHA, employers are prohibited from defeating those statutes by confiscating employees' compensation or otherwise forcing employees to "kick-back" wages to their employers.[165]  Similarly, the AWHA regulations bar employers from "handl[ing] or taking possession of an employee's tips" in the absence of a tip pooling arrangement permitted under the FLSA.[166]

37.     Arguably, however, as both the FLSA and the AWHA are intended to assure that employers pay employees the minimum wage and overtime, where those issues have been addressed, the statutes do not preclude employer confiscation of tips.[167]  Nonetheless, the

---

employees were paid the minimum wage, which has been addressed above.  *See Chung*, 246 F. Supp. 2d at 231.

[163]  *See, e.g.*, *Chung*, 246 F. Supp. 2d at 228-31.

[164]  *See Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048(GEL), 2007 WL 313483, at *18 (S.D.N.Y. Feb. 1, 2007).

[165]  29 C.F.R. § 531.35 ("'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.' The wage requirements of [the FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.  This is true whether the 'kick-back' is made in cash or in other than cash."); Alaska Admin. Code tit. 8, § 15.160 ("Requiring or inducing an employee to return or give up any part of the compensation that the employee is entitled, whether by force, intimidation, or threat of dismissal from employment, or by any other manner, is prohibited.").

[166]  Alaska Admin. Code tit. 8, § 15.907.

[167]  *See Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 580-82 (9th Cir. 2010) (holding that the FLSA tip pooling restriction only applies to employees who receive a tip-credited wage under § 3(m) and an employer may require an employee receiving the full minimum wage to participate in a tip pool); *Platek v. Duquesne Club*, 961 F. Supp. 831, 833-34 (W.D. Pa. 1994) (finding that an employer could not violate § 3(m) where it was paying the employees the full minimum wage and had not taken a tip credit); *Wicaksono v. XYZ 48 Corp.*, No. 10 Civ. 3635(LAK)(JCF), 2011

38

AWHA regulations appear broad enough to encompass employer confiscation by force, threat, or intimidation.[168] Similarly, the argument can be made that confiscation of tips by force, threat, or intimidation in the absence of a formalized tip pool requirement is not permissible under the FLSA.[169]

38.    Regardless, here, there was no agreement to pool tips.  The Court has also found that the tip outs were not coerced as part of a management policy and the dancers at Crazy Horse were not required to purchase souvenirs or make charitable contributions.  Similarly, as the Court has found that the $10 VIP room fee was a service charge and not a tip, Plaintiffs have no basis for seeking the recovery of those fees.  Accordingly, Plaintiffs may not recover any damages on their claims for allegedly forced tip outs, souvenir charges, charitable donations, and VIP room fees.

        C.    *Individual Liability*

39.    Both the FLSA and the AWHA impose liability upon "employers."[170]  The FLSA defines "employer" as including "any person acting directly or indirectly in the interest of an

---

WL 2022644, at *7 n.3 (S.D.N.Y. May 2, 2011) (noting that outside of the provisions dealing with the tip credit method, there is nothing in the FLSA that explicitly prohibits an employer from retaining an employee's tips.  (citations omitted)), *adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011).

[168] *See* Alaska Admin. Code tit. 8, § 15.160.

[169] *Cf. Cumbie*, 596 F.3d at 582 (noting that the regulation preventing kick-backs did not apply because "there existed an agreement to redistribute . . . tips that was not barred by the FLSA" in light of the formalized tip pool requirement).  In any event, even if the statement is accurate, it does not preclude the possibility that employees might have a claim under other laws or common law against an employer who, in the absence of an agreement, confiscates the employees' tips by force, threat, or intimidation.

[170] 29 U.S.C. § 216(b); Alaska Stat. § 23.10.105(a).

39

employer in relation to an employee[.]" The remedial purposes of the FLSA necessarily require a "broad" interpretation of the term,[171] and the AWHA incorporates the FLSA definition.[172]

40.    The FLSA definition includes individuals who exercise "'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship."[173] Thus, the court may consider whether the individuals have a "significant ownership interest," "operational control of significant aspects of the corporations day-to-day functions," "the power to hire and fire employees," "the power to determine salaries," "the responsibility to maintain employment records," responsibility "for handling labor and employment matters," and "responsibility for supervision and oversight of . . . cash management."[174]

41.    Here, Jeanette Johnson was an "employer" for the purposes of the FLSA and the AWHA. Johnson was the owner of Crazy Horse, was managing the club on a day to day basis, and structured the dancers' compensation.

42.    Carol and Kathleen Hartman were also "employers." They were the owners of Fantasies, were regularly present in the club, and Carol Hartman handled the club's bookkeeping and payroll. Marco Gonzalez, however, was not an "employer." The uncontroverted evidence established that he owned a very small stake in the club and had no management authority.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds and concludes that Defendants Crazy Horse, Inc. and Jeanette H. Johnson are liable to Plaintiff Shanna Thornton in the amount of $12,419.50,

---

[171]  *Jeffcoat v. Alaska*, 732 P.2d 1073, 1075 (Alaska 1987) (citation omitted).

[172]  Alaska Stat. § 23.10.145.

[173]  *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (citations omitted).

[174]  *Id.* (citations and alteration marks omitted).

Case 3:06-cv-00251-TMB   Document 232   Filed 06/14/12   Page 40 of 41

Plaintiff Jennifer Prater in the amount of $20,380.35, and Plaintiff Heather Kidd in the amount of

$88,879.99. The Court further finds and concludes that Defendants Sands North, Inc., Kathleen

Hartman, and Carol J. Hartman are liable to Plaintiff Shanna Thornton in the amount of

$27,708.70.

Dated at Anchorage, Alaska, this 14th day of June, 2012.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE